## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CARLA LACEY, derivatively on behalf
of SOUTHERN COPPER
CORPORATION,

              Plaintiff,

      v.

GERMÁN LARREA MOTA-
VELASCO, ALFREDO CASAR
PÉREZ, XAVIER GARCÍA DE
QUEVADO TOPETE, LUIS IGUEL
PALOMINO BONILLA, GILBERTO
PÉREZALONSO CIFUENTES,
CORLOS RUIZ SACRISTÁN,
ENRIQUE CASTILLO SÁNCHEZ
MEHORADA, EMILIO CARRILLO
GAMBOA, ALBERTO DE LA PARRA
ZAVALA, LUIS CASTELAZO
MORALES, ARMANDO ORTEGA
GÓMEZ, DANIEL MUÑIZ
QUINTANILLA, JUAN REBOLLEDO
GOUT, LUIS TÉLLEZ KUENZLER,
AMERICAS MINING CORPORATION,
AND GRUPO MÉXICO S.A.B. DE
C.V.,

              Defendants,

and

SOUTHERN COPPER
CORPORATION,

          Nominal Defendant.

C.A. No. 2019-0312-SG

# MEMORANDUM OPINION

Date Submitted: July 16, 2020
Date Decided: October 6, 2020

Peter B. Andrews, Craig J. Springer, and David Sborz, of ANDREWS & SPRINGER LLC, Wilmington, Delaware; OF COUNSEL: Jeremy S. Friedman, Spencer Oster, and David F.E. Tejtel, of FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York, *Attorneys for Plaintiff Carla Lacey*.

William M. Lafferty, John P. Ditomo, and Elizabeth A. Mullin, of MORRIS, NICHOLS, ARSHT, & TUNNEL LLP, Wilmington, Delaware; OF COUNSEL: Bradley J. Benoit and Bryan Dumesnil, of BRACEWELL LLP, Houston, Texas, and Ralph D. McBride, Houston, Texas, *Attorneys for Defendants Germán Larrea Mota-Velasco, Oscar González Rocha, Alfredo Casar Pérez, Xavier García de Quevedo Topete, Alberto de la Parra Zavala, Luis Castelazo Morales, Armando Ortega Gómez, Daniel Muñiz Quintanilla, Juan Rebolledo Gout, and Southern Copper Corporation*.

Srinivas M. Raju, Andrew J. Peach, Matthew W. Murphy, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Steven R. Selsberg, of S. SELSBERG LAW, P.L.L.C, Houston, Texas, and Sylvia A. Mayer, of S. MAYER LAW PLLC, Houston, Texas, *Attorneys for Defendants Emilio Carrillo Gamboa, Luis Miguel Palomino Bonilla, Gilberto Pérezalonso Cifuentes, Carlos Ruiz Sacristán, Luis Téllez Kuenzler, and Enrique Castillo Sánchez Mejorada*.

Peter J. Walsh, Jr., Matthew F. Davis, and Elizabeth M. Taylor, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware]; OF COUNSEL: Robert J. Giuffra, Jr., David M.J. Rein, Matthew A. Peller, and Y. Carson Zhou, of SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for Defendants Americas Mining Corporation and Grupo México S.A.B. de C.V.*

GLASSCOCK, Vice Chancellor

This derivative matter is before me on a motion to dismiss under Chancery Court Rules 23.1, 12(b)(2), and 12(b)(6). The Plaintiff is a stockholder of Southern Copper Corporation ("Southern Copper"), a Delaware entity. Per the complaint, the defendant directors of the corporation caused it to enter several conflicted transactions with its controllers. According to Article Nine of Southern Copper's corporate charter, these contracts required approval by a committee of independent directors. While the defendant directors represented to stockholders and the public that the corporation was in ongoing compliance with Article Nine, in fact no committee of independent directors had approved the transactions, which, per the Plaintiff, were unfair to the company.

Following argument on the Motion to Dismiss, I denied the motion with respect to allegations of breach of fiduciary duty relating to the defendant directors from the bench, finding that demand was excused based on the substantial likelihood of liability I found they bore.[1] I reserved decision on the motion of the company's controllers, Grupo México S.A.B, de C.V ("Grupo México"), a Mexican citizen, and Americas Mining Corporation, another Delaware entity. Grupo México moved to dismiss on grounds of lack of personal jurisdiction. The only basis the Plaintiff asserts for jurisdiction over Grupo México is that that entity was part of a conspiracy to transfer wealth from Southern Copper to it. Jurisdiction secured by participation

---

[1] *See* Tr. of July 16, 2020 Bench Ruling, Dkt. No. 93.

1

in a conspiracy is limited by constitutional and statutory constraints. An alleged conspiracy between Grupo México and a Delaware entity is not a basis for personal jurisdiction absent a substantial act in Delaware in facilitation of the conspiracy by a fellow conspirator, of which Grupo México was (or should have been) aware. Here, the only act alleged is amending Southern Copper's charter in 2005 to add the protections for stockholders found in Article Nine. Per the Plaintiff, Grupo México participated in this charter restatement, due to its having appointed Grupo México allies to the Southern Copper board. But this act did not—could not—advance the alleged conspiracy to wrongfully transfer wealth from Southern Copper to its controllers; in fact, Article Nine was designed to protect stockholders *from precisely this risk*. It thus impeded, not furthered, Grupo México's ability to loot Southern Copper. Because this is the sole act alleged to support a conspiracy theory of jurisdiction, and because no other basis for personal jurisdiction over Grupo México is alleged, Grupo México's motion to dismiss under Rule 12(b)(2) must be granted. My rationale is below.

## I. Background[2]

This action is brought by plaintiff Carla Lacey derivatively on behalf of nominal defendant Southern Copper. The Plaintiff alleges both breach of contract

---

[2] Except where otherwise noted, facts referenced here are drawn from Pl.'s Verified Am. Derivative Compl., Dkt. No. 49 ("Am. Compl." or the "Complaint").

and breach of fiduciary duty by certain current and former directors of Southern Copper (the "Director Defendants") and its controlling stockholders (the "Controllers"), including Grupo México; Germán Larrea Mota-Velasco ("Germán Larrea"), Grupo México's Chairman, President, and CEO; and Americas Mining Corporation ("AMC"), Grupo México's wholly-owned subsidiary.

On June 18, 2020, the Court heard oral argument on all defendants' motions to dismiss.[3] I later denied the Director Defendants' Motion to Dismiss with respect to the Plaintiff's claims for breach of fiduciary duty.[4] In this Opinion, I address Grupo Mexico's Motion to Dismiss under Rule 12(b)(2).

### A.     The Parties

The following facts, drawn from the Complaint, are deemed true for purposes of this Motion to Dismiss.

The Plaintiff is, and has been, at all relevant times, a holder of Southern Copper common stock.[5]

---

[3] *See* Tr. of Oral Arg. on Defs.' Mot. to Dismiss, Dkt. No. 92.
[4] *See* Tr. of July 16, 2020 Bench Ruling 7–8, Dkt. No. 93.
[5] Am. Compl. ¶ 7.

Nominal defendant Southern Copper is a Delaware corporation with its headquarters in Phoenix, Arizona.[6] It operates mining, smelting, and refining facilities in Mexico and Peru that produce copper and other minerals.[7]

Defendant Germán Larrea has served on the boards of both Grupo México and nominal defendant Southern Copper.[8] He has been a member of Grupo México's board of directors since 1981 and has been Chairman, President, and CEO since 1994.[9] He has also served as Chairman of Southern Copper's board of directors (the "Board") since 1999 and was Southern Copper's CEO from December 1999 to October 2004.[10]

Defendant Oscar Gonzáles Rocha ("Gonzáles Rocha") has served as a member of Southern Copper's Board since November 1999, as President of Southern Copper since December 1999, as General Director and Chief Operating Officer from December 1999 to October 2004, and as CEO since October 2004.[11] Gonzáles Rocha is also CEO and a director of Asarco, LLC ("Asarco"), President and CEO of AMC, and a director of Grupo México.[12]

---

[6] *Id.* at ¶ 8.
[7] *Id.*
[8] *See id.* at ¶ 9.
[9] *See id.* at ¶¶ 9–10.
[10] *Id.* at ¶ 9.
[11] *Id.* at ¶ 11.
[12] *Id.*

Defendant Alfredo Casar Pérez ("Casar Pérez") has served as a member of Southern Copper's Board since October 2006, and is also a director of Grupo México.[13]

Defendant Xavier García de Quevado Topete ("García de Quevado") has served as a member of Southern Copper's Board since November 1999,[14] and served as Chief Operating Officer from April 2005 to April 2015.[15] García de Quevado has also worked as an executive for Grupo México and its subsidiaries for over 40 years.[16]

Defendant Luis Miguel Palomino Bonilla ("Palomino") has served as a member of Southern Copper's Board since March 2004.[17] He was nominated to the Board by Grupo México.[18] Palomino has also served as a member of the audit committee of Southern Copper (the "Audit Committee") since March 2004, which was tasked with undertaking prior independent review of material related-party transactions as required by Article Nine of Southern Copper's Charter.[19]

---

[13] *Id.* at ¶ 12.
[14] *Id.* at ¶ 13.
[15] *Id.*
[16] *Id.*
[17] *Id.* at ¶ 15.
[18] *Id.*
[19] *Id.*

Defendant Gilberto Pérezalonso Cifuentes ("Pérezalonso") has served as a member of Southern Copper's Board since June 2002.[20] He was nominated to the Board by Grupo México.[21] Since June 2002, Pérezalonso has also served as a member of the Audit Committee.[22]

Defendant Carlos Ruiz Sacristán ("Ruiz Sacristán") has served as a member of Southern Copper's Board since February 2004.[23] He was nominated to the Board by Grupo México.[24] He served as Chairman of the board of Grupo México and Asarco from 2005–2010.[25]

Defendant Enrique Castillo Sánchez Mejorada (Castillo Sánchez Mejorada) has served as a member of Southern Copper's Board since 2010.[26] Since 2013, Castillo Sánchez Mejorada has also served as a member of the Audit Committee.[27]

Defendant Emilio Carrillo Gamboa ("Carillo Gamboa") served as a member of Southern Copper's Board from May 2003 until April 2018.[28] During that same time frame, he also served as a member of the Audit Committee.[29]

---

[20] *Id.* at ¶ 16.
[21] *Id.*
[22] *Id.*
[23] *Id.* at ¶ 18.
[24] *Id.*
[25] *Id.*
[26] *Id.* at ¶ 20.
[27] *Id.*
[28] *Id.* at ¶ 22.
[29] *Id.*

Director Alberto de la Parra Zavala ("de la Parra") served as a member of Southern Copper's Board from July 2007 to April 2013.[30] He also served as General Counsel to Grupo México and as Corporate Secretary to the board of directors of Grupo México from 2007–2012.[31]

Defendant Luis Castelazo Morales ("Castelazo Morales") served as a member of Southern Copper's Board from September 2010 to June 2016.[32] He has also served as a non-independent director of Grupo México since 2016.[33]

Defendant Armando Ortega Gómez ("Ortega Gómez") served as a member of Southern Copper's Board from February 2005 to October 2010.[34] He also served as Southern Copper's General Counsel, Vice President of Legal, and Secretary from April 2002 to October 2010, and as General Counsel for Grupo México from May 2001 to February 2007.[35]

Defendant Daniel Muñiz Quintanilla ("Muñiz") served as a member of Southern Copper's Board from May 2008 to July 2018, and as Executive Vice

---

[30] *Id.* at ¶ 24.
[31] *Id.*
[32] *Id.* at ¶ 25.
[33] *Id.*
[34] *Id.* at ¶ 26.
[35] *Id.*

7

President from April 2016 to July 2018.[36] He also served as General Counsel for Grupo México from May 2001 to February 2007.[37]

Defendant Juan Rebolledo Gout ("Rebolledo") served as a member of Southern Copper's Board from May 2003 to September 30, 2015 and has also served as International Vice President of Grupo México since 2001.[38]

Defendant Luiz Téllez Kuenzler ("Téllez") served as a member of Southern Copper's Board from March 2010 to April 2011.[39]

Defendant AMC is a wholly-owned subsidiary of Grupo México incorporated in Delaware.[40] AMC has owned a majority of Southern Copper's common stock at all times relevant to this action.[41] AMC also owns 100% of Asarco.[42] Asarco is not a party to this action but is party to several of the transactions challenged in the Complaint.

Defendant Grupo México is a Mexico-based holding company focusing on the mining, construction, and transportation sectors.[43] It is headquartered in Mexico

---

[36] *Id.* at ¶ 27.
[37] *Id.*
[38] *Id.* at ¶ 28.
[39] *Id.* at ¶ 29.
[40] *Id.* at ¶ 30.
[41] *Id.*
[42] *Id.*
[43] *Id.* at ¶ 35.

8

City.[44]  Grupo México owns 100% of AMC stock[45] and has been an indirect majority stockholder of Southern Copper since 1999.[46]

### B. Relevant Facts

### 1. Southern Copper's Charter

Southern Copper's charter (the "Charter") was enacted in 1995 and restated in 2005.[47]  Article Nine of the Charter ("Article Nine"), included when the Charter was restated in 2005, prohibits Southern Copper from entering into transactions involving consideration in excess of $10,000,000 with Grupo México or any of its affiliates without prior review by a committee of independent Southern Copper directors.[48]  The Director Defendants were aware of these requirements and approved public filings which detailed the Board's obligations under Article Nine each year from 2005 through 2016.[49]

---

[44] *Id.* at ¶ 31.

[45] *Id.*

[46] *See id.* at 42.

[47] *Id.* at ¶ 45.

[48] *Id.*  Article Nine of Southern Copper's Charter states the following:
> [Southern Copper] shall not engage in any Material Affiliate Transaction unless it has been the subject of prior review by a committee of the Board of Directors with at least three members, each of whom is an Independent Director. . . . [A] 'Material Affiliate Transaction' shall mean any transaction, business dealing or material financial interest in any transaction, or any series of related transactions, between Grupo México or one of its affiliates (other than [Southern Copper] or any of [Southern Copper's] subsidiaries), on the one hand, and [Southern Copper] or one of [Southern Copper's] subsidiaries, on the other hand, that involves consideration of more than $10,000,000 in the aggregate. *Id.*

[49] *Id.* at ¶ 46.  For example, Southern Copper's Schedule 14As filed each year from 2007 to 2016 state that "[t]he Company is prohibited from entering or continuing a material related party transaction that has not been reviewed and approved by the Audit Committee."  *Id.*

9

### 2. *The Challenged Transactions*

The Plaintiff presents several material related-party transactions that were not subject to prior review by a committee of independent Southern Copper directors as required by Article Nine. These violations came to light during a prior litigation filed in this Court on December 7, 2015 (the "Power Plant Litigation").[50] During the course of discovery in that case, Southern Copper identified dozens of related party transactions since January 2004, all but one of which were not subjected to the prior review required by Article Nine.[51] A subset of those transactions make up those discussed here (the "Challenged Transactions"). Each of the Challenged Transactions allegedly had a value greater than $10 million, were not independently reviewed as required by Article Nine, and were unfair to Southern Copper or one of its subsidiaries.[52]

The details of the transactions are of tangential relevance to Grupo Mexico's Motion to Dismiss for lack of personal jurisdiction. For the sake of completeness, I adumbrate each below.

---

[50] *See id.* at ¶¶ 4, 49.

[51] *See id.* at ¶ 53. The one transaction that did received prior independent review was the subject of *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761 (Del. Ch. 2011), in which then-Chancellor Strine found that AMC and directors designated by Grupo México had breached their fiduciary duties to Southern Copper. *Id.*

[52] *Id.* at ¶ 55.

10

### a) *The Buenavista del Cobre Tailings Dam*

The first of the Challenged Transactions concerns a contract awarded to Grupo México subsidiary México Compañía Constructora, S.A. de C.V. ("MCC") by Southern Copper subsidiary Buenavista del Cobre S.A. de C.V. ("BDC") for the construction of a new dam to contain mineral processing runoff at the Buenavista copper mine. Construction of this dam would consist of three phases: (1) the construction of the curtain, a barrier sufficient to store the first three years of tailings produced by the Buenavista Mine's second processing plan; (2) increasing the capacity of the dam; and (3) incremental maintenance and capacity increases to be performed over the lifetime of the mine, approximately 40 years.[53]

BDC's direct parent, Southern Copper subsidiary Minera México, S.A. de C.V. ("Minera"), conducted a private bidding process for the first phase of construction at the end of 2013.[54] Minera selected two other companies to participate, each with less experience building tailings dams than MCC.[55] MCC's bid of $44.1 million was the lowest and BDC selected MCC as the contractor for the project.[56]

---

[53] *Id.* at ¶ 57.
[54] *Id.* at ¶ 58.
[55] *Id.* at ¶ 62.
[56] *Id.* at ¶ 58. The next lowest bid was $69.5 million. *Id.*

On the same day that BDC and MCC entered a contract for the first phase, BDC also awarded MCC the contract for the second phase of construction, worth $156.5 million, without another bidding process.[57] Both contracts imposed upon Minera what, per the Plaintiff, was a disproportionate amount of risk and cost.[58]

### b) Phase 2 La Caridad Tailings Dam

MCC was also awarded a contract to reinforce the curtain of Tailings Dam 7 at Southern Copper's mine in Sonora, Mexico (the "La Caridad Dam") by Southern Copper subsidiary Mexicana del Cobre, S.A. de C.V. in 2010.[59] This contract also contained terms that were more favorable to MCC than they were to Southern Copper's subsidiary.[60]

### c) Former IMMSA Metallurgical Complex

On January, 29, 2010, Southern Copper subsidiary Industrial Minera México, S.A. de C.V. ("IMMSA") awarded MCC a contract to dismantle and remove a former metallurgical complex in San Luis Potosí, Mexico so that the area could be remediated for a non-industrial use.[61] Later, on September 9, 2013 IMMSA awarded MCC a contract to remediate the soil at that site as well.[62] Both contracts were

---

[57] *Id.* at ¶ 59.
[58] *Id.* at ¶¶ 63–64, 66–71.
[59] *Id.* at ¶ 73.
[60] *See id.* at ¶¶ 76–78.
[61] *Id.* at ¶ 80.
[62] *Id.*

directly awarded without a competitive bidding process, despite MCC's lack of expertise in these areas. [63] Like the other Challenged Transactions, the IMMSA contracts lacked several standard contractual protections for Minera.[64]

### d) The Minerals Contracts

Between 2010 and 2017, various Southern Copper subsidiaries entered into several contracts with Asarco, a wholly-owned subsidiary of AMC, for the purchase and sale of raw materials used in copper production.[65] In the aggregate, these contracts were worth over $300 million.[66]

### e) The Transportation Contracts

Certain Southern Copper subsidiaries contract with Grupo México subsidiary Grupo Ferroviario Mexicano, S.A. de C.V. ("Ferromex")[67] to transport copper and other materials on its rail lines to as well as for improvement and maintenance of those rail lines.[68] Pursuant to these contracts, Southern Copper paid Ferromex over

---

[63] The IMMSA remediation contract was MCC's first soil remediation project. *Id.*

[64] *See id.* at ¶¶ 83–90.

[65] *Id.* at ¶ 92. The Southern Copper subsidiaries involved include Mexicana del Cobre, S.A. de C.V., Operadora de Minas e Instalaciones Mineras, S.A. de C.V., and Metalúrgica del Cobre, S.A. de C.V. *See id.* at ¶¶ 92, 92 n.53, 98.

[66] *See id.* at ¶¶ 95, 98.

[67] I note that Grupo México and AMC refer to this entity in their Opening Brief as "Ferrocarril Mexicano, S.A. de C.V." Opening Br. of Grupo México and AMC 11, Dkt. No. 66.

[68] Am. Compl. ¶ 101.

$150 million for use of its rail lines and other services from 2010 through the first quarter of 2017.[69]

### f) The Support Services Agreements

Lastly, the Plaintiff alleges that Grupo México and Southern Copper are parties to an administrative support services contract whereby Southern Copper directly pays Grupo México $13.8 million per year in fees.[70]

### 3. Southern Copper's Audit Committee Review

While the Power Plant Litigation was ongoing, Southern Copper's Audit Committee formed a subcommittee of outside directors to review certain past transactions that may have failed to comply with Article Nine.[71] The subcommittee retained KPMG Cardenas Dosal, S.C. ("KPMG") and EY México ("EY") to evaluate the reasonableness of pricing in related-party transactions identified by Southern Copper and its directors in the Power Plant Litigation.[72] These consultants issued final reports in 2018 that found little fault with the pricing of the past

---

[69] *Id.*

[70] *Id.* at ¶ 108. Southern Copper's filings with the SEC from 2005 to 2017 contain substantively the same disclosure, as demonstrated by its Schedule 14A, filed March 24, 2016: "Grupo México, our ultimate parent and our majority indirect stockholder and its affiliates, provide various services to us. In 2015, these activities were primarily related to accounting, legal, tax, financial, treasury, human resources, price risk and hedging, purchasing, procurement and logistics, sales and administrative and other support services. We pay Grupo México for these services. The total amount paid by us to Grupo México for such services in 2015 was $13.8 million. We expect to continue to pay for these support services in the future." *See id.* at ¶ 108 n.60.

[71] *Id.* at ¶ 112.

[72] *Id.* at ¶ 113.

transactions, but recommended a variety of corporate governance improvements for Southern Copper to implement in the future.[73] Their recommendations included, among other suggestions, implementing transfer pricing and benchmarking assessments, requiring competitive bidding processes for construction contracts, better documentation of related-party transactions, and ensuring that an independent committee review future related party contracts—as already required by Article Nine of the Charter.[74]

### C.    Procedural History

The Plaintiff filed the Amended Complaint on October 25, 2019, alleging breach of contract and breach of fiduciary duty on the part of the Director Defendants, and breach of fiduciary duty on the part of the Controllers. I heard oral argument on all defendants' motions to dismiss on June 18, 2020. On July 16, 2020, I delivered a telephonic bench ruling[75] denying the Director Defendants motion to dismiss with respect to breach of fiduciary duty, and took the remaining motions under consideration as of that date. This opinion addresses only defendant Grupo México's motion to dismiss for lack of jurisdiction under Chancery Court Rule 12(b)(2).

---

[73] *Id.* at ¶¶ 114–15.
[74] *See id.* at ¶¶ 115–18.
[75] *See* Tr. of July 16, 2020 Bench Ruling, Dkt. No. 93.

## II.     Applicable Legal Standard

Grupo México has moved to dismiss for lack of personal jurisdiction under Chancery Court Rule 12(b)(2).  Unlike a 12(b)(6) motion, on a 12(b)(2) motion "the Court is not constrained simply to accept the well pleaded allegation[s] of the complaint as true."[76]  Instead, the issue "may be resolved on the basis of the complaint or evidence extrinsic to the complaint."[77]  Ordinarily, when a defendant moves to dismiss pursuant to 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction"[78]  However, where, as here, "no evidentiary hearing has been held, a plaintiff need only make a prima facie showing of personal jurisdiction, and the record is construed in the light most favorable to the plaintiff."[79]

## III.     Analysis

Grupo México is a Mexican company that is not alleged to have done business in or otherwise have a connection with this forum.  The Plaintiff asserts that jurisdiction over Grupo México is proper nonetheless, under the conspiracy theory of jurisdiction.[80]

---

[76] *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *4 (Del. Ch. May 9, 2001).
[77] *Id.*
[78] *Konstantino v. AngioScore, Inc.*, 2015 WL 5770582, at *6 (Del. Ch. Oct. 2, 2015) (quoting *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007)).
[79] *Id.*
[80] *See* Pl.'s Answering Br. 54–60, Dkt. No. 73.

This theory does not attempt to create a separate basis for jurisdiction,[81] which must be based on the Long-Arm statute as delimited by due process. Instead, it is a rubric for including actors who knowingly participate in behaviors, by a fellow conspirator, that subject that conspirator to jurisdiction. In other words, the conspiracy theory of jurisdiction asserts that those who seek to avoid our courts by acting at a distance may nevertheless create sufficient minimum contacts with Delaware to satisfy the long-arm statute and due process.[82]

The conspiracy theory of jurisdiction is based on the legal principle that the actions of one conspirator can be attributed to fellow conspirators.[83] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[84]

Under the conspiracy theory, the plaintiff must make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy

---

[81] *Skye Mineral Investors, LLC v. DXS Capital (U.S.) Ltd.*, 2020 WL 881544, at *9 (Del. Ch. Feb. 24, 2020).

[82] *See id.* ("The conspiracy theory is not an independent basis to demonstrate personal jurisdiction; it is, rather, a means by which a plaintiff may advance his case for personal jurisdiction under the long-arm statute.").

[83] *See Matthew v. Fläkt Woods Gp. S.A.*, 56 A.3d 1023 (Del. 2012); *Istituto Bancario Italiano, SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210 (Del. 1982); *Skye Mineral Investors, LLC v. DXS Capital (U.S.) Ltd.*, 2020 WL 881544 (Del. Ch. Feb. 24, 2020).

[84] *Istituto Bancario*, 449 A.2d at 222.

occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[85] Because the test runs the risk of expanding jurisdiction to encompass defendants who would otherwise be beyond the reach of the forum, the test is construed narrowly, requiring factual proof of each of the five elements.[86] Accordingly, a sufficient pleading of jurisdiction must assert facts sufficient to that end, viewed in the light, and aided by those reasonable inferences, most helpful to the plaintiff.

---

[85] *Id.* at 225. Because this five-part test "functionally encompass[es]" both prongs of the Delaware long-arm statute—a statutorily defined nexus to the state as well as compliance with constitutional notions of due process—a plaintiff that can meet all five elements of the conspiracy theory will have also satisfied both prongs of the jurisdictional test. *Konstantino v. AngioScore, Inc.*, 2015 WL 5770582, at *7 (Del. Ch. Oct. 2, 2015) (quoting *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015)); *see also Skye Mineral Investors*, 2020 WL 881544, at *9.

[86] *LVI Grp. Investments, LLC v. NCM Grp. Holdings, LLC*, 2017 WL 3912632, at *2 (Del. Ch. Sept. 7, 2017); *see also Hercules Inc. v. Leu Trust and Banking*, 611 A.2d 476, 482 n.6 (Del. 1992) ("[T]he 'conspiracy theory' merely provides a framework with which to analyze a foreign defendant's contacts with Delaware. We do not view the conspiracy as an independent jurisdictional basis"); *Istituto Bancario,* 449 A.2d at 225 (noting that conspiracy jurisdiction is "a strict test" that applies if the plaintiff makes a "factual showing" of required elements); *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011) ("Delaware courts construe this test narrowly and require a plaintiff to assert specific facts, not conclusory allegations, as to each element"); *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *7 (Del. Ch. May 10, 1994) ("all of [the five elements] must be satisfied before a Delaware court may exercise personal jurisdiction.").

The Plaintiff here maintains she has met the *Istituto Bancario* test with well-pled allegations in her Amended Complaint.[87] Grupo México disagrees, arguing that the Complaint fails adequately to allege (1) that a conspiracy was formed, (2) that Grupo México knew of or participated in the supposed-conspiracy, and (3) that any substantial acts in furtherance of the conspiracy were committed in Delaware.[88] Because I find that the Complaint does not allege any acts taken in Delaware that could be in furtherance of a conspiracy, I conclude that this Court lacks personal jurisdiction over Grupo México.

### A. The Southern Copper Conspiracy

Under the *Istituto Bancario* test, I first ask whether the Plaintiff has carried their *prima facie* burden to demonstrate that a conspiracy existed and that Grupo México was a member of that conspiracy.[89] The Plaintiff's Complaint nowhere mentions a conspiracy. The Complaint does, however, allege a series of transactions that, per my previous oral ruling,[90] adequately state a claim for breach of fiduciary

---

[87] Pl.'s Answering Br. 57, Dkt. No. 73.

[88] Reply Br. of Grupo México and AMC 3, Dkt. No. 78 ("[T]he Opposition merely incants the unsupported conclusion that Grupo México caused Southern Copper to engage in the Challenged Transactions.").

[89] "The existence of a conspiracy is tested by reference to an additional five elements: '(1) two or more persons; (2) some object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) resulting proximate damages.'" *Skye Mineral Investors*, 2020 WL 881544, at *10 (quoting *Hartsel v. Vanguard Group.*, 2011 WL 2421003, at *10).

[90] *See generally* Tr. of July 16, 2020 Bench Ruling, Dkt. No. 93.

duty by the Director Defendants. The Plaintiff's Answering Brief argues that Grupo México, conspiring with the Director Defendants, "caused [Southern Copper] to engage repeatedly in transactions for [Grupo México]'s benefit that violated Article Nine (and fiduciary duties regulated by Delaware law)."[91] In short, the Plaintiff asks me to infer, from the fact that the Challenged Transactions occurred, that Grupo México caused them to occur *pursuant to a conspiracy between the Defendants*. The Amended Complaint, I note, does not allege an aiding and abetting claim.[92] Grupo Mexico argues that this pleading, standing alone, is insufficient to support an inference that it conspired with the other Defendants. In any event, because (as I find below) the Amended Complaint fails adequately to allege an act in furtherance of the conspiracy in Delaware, I need not decide whether I may infer a conspiracy from the facts alleged.

## B. The Acts in Delaware

Even assuming that Grupo México was a part of a conspiracy, in order to establish jurisdiction the Plaintiff would have to allege that a substantial act in furtherance of that conspiracy was taken in Delaware. Because each of the

---

[91] Pl.'s Answering Br. 54–55.

[92] It would be helpful to the Plaintiff's theory if, in addition to pleading breach of fiduciary duty, the Complaint sufficiently pled a related claim for aiding and abetting breach of that duty against Grupo México. *See Virtus Capital*, *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *13 (Del. Ch. Feb. 11, 2015) ("Sufficiently pleading a claim for breach of fiduciary duty and a related claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Istituto Bancario* test.").

Challenged Transactions occurred in Mexico between Mexico-domiciled subsidiaries of Grupo México and Southern Copper,[93] those transactions cannot be the source of jurisdiction over Grupo México. Instead, the Plaintiff argues that a single act took place in furtherance of the Conspiracy in this state: that Grupo México "used its control over [Southern Copper], a Delaware entity, to cause [Southern Copper] to enact a Charter that is governed by Delaware law and includes Article Nine, which places specific restrictions on [Grupo México]."[94] Article Nine was added to the Charter when it was restated in 2005.[95] I assume here that the pleadings of the Amended Complaint are sufficient for an inference that Grupo Mexico had, or should have had, knowledge of this act. Filing a corporate instrument in Delaware is an act occurring in the State.[96] If done in material furtherance of a conspiracy, a charter amendment could confer personal jurisdiction under the *Istituto Bancario* test. In this case, however, per the Plaintiff, Article Nine "was included *for the protection of Southern Copper and its minority stockholders* from an abuse of power by its Controllers."[97] Therefore, as set out in the Amended Complaint,

---

[93] None of the contracts are alleged to have been performed in Delaware.

[94] Pl.'s Answering Br. 54–55.

[95] *See* Taylor Aff., Ex. 5 (the Amended and Restated Certificate of Incorporation of Southern Peru Copper Corporation). Southern Copper was formerly known as Southern Peru Copper Corporation. *See* Am. Compl. ¶ 37.

[96] *See Matthew v. Fläkt Woods Grp. SA*, 56 A.3d 1023, 1027–28 (Del. 2012); *Reid v. Siniscalchi*, 2014 WL 6589342, at *10 (Del. Ch. Nov. 20, 2014) ("When done as an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute.").

[97] Am. Compl. ¶ 150 (emphasis added).

21

Article Nine was meant to prevent the precise bad acts that the Defendants supposedly conspired to bring about. Article Nine is the axle around which the wheel of liability here must turn. Its adoption is manifestly not an act in furtherance of the alleged conspiracy. The Amended Complaint itself describes Article Nine as the Charter device that "protect[s] [Southern Copper] from abuse by Grupo México,"[98] and its creation cannot be both that *and* a conspiratorial act intended to facilitate its own violation.

In asserting jurisdiction, the Plaintiff relies heavily on *Virtus Capital*.[99] An examination of that well-reasoned case is instructive here. The case involved a controller causing a chemical company, Sterling, to sell itself at a fire-sale price.[100] The controller and his conspirators took acts in Delaware to further the conspiracy in two instances, both of which, the Court found, were sufficient to support conspiracy-theory jurisdiction.[101] First, the certificate of merger, necessary to the consummation of the wrongful transaction, was filed in Delaware with the Secretary of State.[102] The second instance is more apt here. The controller and his conspirators pursed the merger by creating two additional Delaware entities to facilitate the sale. "[The controller] did not have to create the liquidating vehicles; Fund I, Fund II, and

---

[98] *Id.* at ¶ 2.
[99] *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553 (Del. Ch. Feb. 11, 2015).
[100] *Id.*
[101] *Id.* at *14.
[102] *Id.*

the International Fund could have distributed their Sterling holdings to their investors. But if [the controller] had chosen that route, then he would have given up his control over a majority of Sterling's outstanding voting power and could not have caused the various Resurgence entities to approve the Sterling Transaction through action by written consent. The Complaint sufficiently alleges that forming the liquidating vehicles was an integral part of the process that led to the Sterling Transaction." [103] This stands in contrast to the action here, where adding Article Nine to the corporate charter did not facilitate, let alone form an "integral part," of any conspiracy.

To the extent that the Plaintiff argues that perhaps the Southern Copper Defendants and Grupo Mexico conspired to add protections to the corporate Charter to throw sleuthing stockholders like the Plaintiff off the scent of self-dealing, and, in that way, the amendment of the Charter furthered the conspiracy, I must draw inferences in favor of the Plaintiff, true, but only reasonable inferences.[104] Therefore, I need not consider this theory further.

## IV. Conclusion

The Plaintiff's sole argument for subjecting Grupo México to the jurisdiction of this Court is that, in facilitating the amendment of Article Nine, it has participated

---

[103] *Id.*
[104] *E.g. Clinton v. Enterprise Rent-a-Car Co.,* 977 A.2d 892, 895 (Del. 2009).

in an act in Delaware in furtherance of a conspiracy against Southern Copper. But the Plaintiff cannot successfully posit both that Article Nine was put in place to protect Southern Copper from being looted by its parent Grupo México, and that amending Southern Copper's Charter to include those protections itself enabled exactly that wrong. Because the Plaintiff fails to adequately allege that Grupo México is subject to personal jurisdiction under the conspiracy theory, the Plaintiff's claims against Grupo México are dismissed.

The other Defendants' Motions to Dismiss remain outstanding. The parties should consult, provide a form of order consistent with the decision above, and inform me in light of this decision and my Bench Ruling of July 16, 2020 what matters remain to be addressed in connection with the Motion to Dismiss.